**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-20185-CR-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

     Plaintiff,

v.

MARIO RENE DE LA TORRE,
YUMET DE LA TORRE, and
JOE LEWIS MCHOMES,

     Defendants.

_____/

**REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION TO DISMISS INDICTMENT**

This matter is before the Court on Defendant Mario Rene De La Torre's motion to dismiss indictment.[1] [D.E. 41]. The Government filed its response in opposition on June 16, 2022, [D.E. 19], to which Mr. De La Torre timely filed a reply, [D.E. 45]. The Court subsequently ordered supplemental briefing, [D.E. 48, 60], and the parties promptly complied, [D.E. 51, 58, 67]. Having reviewed the briefing, the record, and otherwise being fully advised in the premises, the Court recommends that the motion be **GRANTED**. Accordingly, the Superseding Indictment, [D.E. 6], should be **DISMISSED WITH PREJUDICE**.

---

[1]    This motion was referred to the undersigned Magistrate Judge for report and recommendation. [D.E. 47].

# I.    BACKGROUND

In March 2020, as the COVID-19 pandemic began to disrupt American life, reports emerged that the United States Department of Justice was quietly asking Congress to alter its prosecutorial powers.[2]  One proposed alteration asked Congress to pause the statutes of limitations in criminal cases during national emergencies and for an additional year following the end of the national emergency.[3]  These requests drew public condemnation from both sides of the aisle: Representative Andrew Biggs, a Republican from Arizona, wrote that "[t]he federal government should NOT use the coronavirus pandemic to arrogate power and abuse the constitutional rights of Americans. This request by the Department of Justice is an unwarranted move to authoritarianism, which must be fought aggressively.";[4]  Representative Hakeem Jeffries, a Democrat from New York, rhetorically asked "[m]ore power to the so-called Attorney General? PASS.";[5] and Senator Michael Lee, a Republican from Utah,

---

[2]    Betsy Woodruff Swan, *DOJ Seeks New Emergency Powers Amid Coronavirus Pandemic*, POLITICO (Mar. 21, 2020, 1:01 PM), https://www.politico.com/news/2020/03/21/doj-coronavirus-emergency-powers-140023; Matt Zapotosky, *Justice Department's Coronavirus Considerations Rankle Civil Liberties Advocates*, WASHINGTON POST (Mar. 23, 2020, 6:52 PM), https://www.washingtonpost.com/national-security/justice-department-coronavirus-laws/2020/03/23/6b860018-6d01-11ea-b148-e4ce3fbd85b5_story.html; *see also* Abbe David Lowell, *et al.*, *Problems with Federal Courts Tolling Statutes of Limitations*, LAW 360 (May 7, 2020, 5:12 PM), https://www.law360.com/articles/1270318.

[3]    Woodruff Swan, *supra* note 2; Zapotosky, *supra* note 2; Lowell, *supra* note 2.

[4]    Andrew Biggs (@RepAndyBiggsAZ), TWITTER (Mar. 22, 2020, 12:04PM), https://twitter.com/RepAndyBiggsAZ/status/1241757654558691330.

[5]    Hakeem Jeffries (@RepJeffries), TWITTER (Mar. 22, 2020, 11:02 AM), https://twitter.com/RepJeffries/status/1241741968830496773.

claimed that the requested powers would be granted "OVER MY DEAD BODY."[6] Ultimately, the statutes of limitations that apply to federal crimes were not modified by Congress in response to the pandemic.[7]   And without that modification, the Government found itself in a difficult position when, on March 26, 2020, all Grand Jury service in the Southern District of Florida was suspended until November 17, 2020, due to the health risks associated with COVID-19.[8]

On August 11, 2020, the Government accused Mr. De La Torre of sixteen violations of federal law.[9]   Unable to convene a Grand Jury for the purpose of securing an indictment against Mr. De La Torre, the Government made these criminal accusations by submitting an "Information" to the Clerk who subsequently filed it on this Court's public docket.[10]

The Government provided Mr. De La Torre with a copy of the Information eight days after it was filed.[11]   The problem was, however, that he was not arrested at that

---

[6]   Michael Lee (@SenMikeLee), TWITTER (Mar. 21, 2020, 7:30 PM), https://twitter.com/SenMikeLee/status/1241507516980375555.

[7]   *Compare*, *e.g.*, 18 U.S.C. § 3282 (2019) *with, e.g.*, 18 U.S.C. § 3282 (2022).

[8]   S.D. Fla. Admin. Order 2020-22; S.D. Fla. Admin. Order 2020-87.

[9]   The initial charges included: Count 1 (conspiracy to commit mail and wire fraud); Counts 2-6 (mail fraud); Count 7-11 (wire fraud); Count 12 (conspiracy to commit money laundering); Count 13 (money laundering); Count 14 (conspiracy to defraud the United States); Count 15 (aiding and abetting the filing of a false tax return); and Count 16 (making and subscribing a false tax return).  [D.E. 1].

[10]   [D.E. 1].

[11]   [D.E. 44 at 3].

time, nor was he brought before the Court to be apprised of his rights or to receive an objective probable cause determination.  To the contrary, on September 25, 2020, the prosecutor assigned to this case met with Mr. De La Torre (and his lawyer) via video conference to discuss the evidence that the Government intended to "introduce at trial to prove the facts alleged in the Information."[12]

The parties agree that, since learning of the Information in August 2020, Mr. De La Torre has steadfastly refused to waive his constitutional right to be prosecuted pursuant to an indictment returned by the Grand Jury.[13]  But even though Grand Jury service resumed on November 17, 2020, the Government did not obtain the "Superseding Indictment" against Mr. De La Torre until February 10, 2022 – roughly *fifteen* months later.[14]

The content of the Superseding Indictment is remarkably similar to that of the Information, with a couple of notable exceptions.  First, two of the sixteen charges have been dropped, bringing the total number of alleged criminal violations down to fourteen.  And second, Mr. De La Torre's wife, Yumet De La Torre, who was identified

---

[12]     [D.E. 44 at 4].

[13]     U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]").

[14]     [D.E. 6].

as a defendant and co-conspirator in the Information, is not listed as a defendant in the Superseding Indictment.[15]

Following the return of the Superseding Indictment, Mr. De La Torre was arrested and then released on a bond that severely restricts, among other things, his right to travel, his right to possess a firearm for self-defense, and his right to sell some of his most valuable property.[16]

Mr. De La Torre subsequently moved to dismiss the Superseding Indictment, seeking to establish that nine of the fourteen alleged counts are foreclosed from prosecution by the relevant statutes of limitations.[17]  Upon reviewing the record in this case, however, the Court became concerned that the briefing related to Mr. De La Torre's motion may have been less than comprehensive; accordingly, the Court ordered the parties to submit supplemental briefing.[18]  And so, with the benefit of a fully briefed record, Mr. De La Torre's motion is now ripe for disposition.

---

[15]   By contrast, Joe McHomes, the third defendant and final co-conspirator identified in the Information, is also listed as a defendant in the Superseding Indictment. [D.E. 6].

[16]   *See* [D.E. 17]; *see also, e.g., Dunn v. Blumstein*, 405 U.S. 330, 338 (1972) (describing the right to interstate travel as a "fundamental" right); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2150-51 (2022) (describing the right to carry a firearm for self-defense as a "fundamental" right).

[17]   [D.E. 41] (moving to dismiss with prejudice Counts 2-5, 7-10, and 13).

[18]   [D.E. 48, 60].

## II.    ANALYSIS

### A.    Most of the counts in the Superseding Indictment are barred from prosecution by the relevant statutes of limitations.

The Fifth Amendment to the Constitution of the United States provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]" U.S. CONST. amend. V.  Although formally ratified in 1791, the individual's right of prosecution by Grand Jury indictment is a guarantee to felony defendants that predates the establishment of our nation.  *See Costello v. United States*, 350 U.S. 359, 361-62 (1956).   Specifically,

> The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or indictments on such information as they deemed satisfactory. Despite its broad power to institute criminal proceedings the grand jury grew in popular favor with the years. It acquired an independence in England free from control by the Crown or judges. Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice.

*Id.* at 362.

The Framers of our Constitution, most of whom were trained in English law, accepted the Grand Jury as a "basic guarantee of individual liberty" because it functions as a "barrier" to "reckless or unfounded charges."   *United States v. Mandujano*, 425 U.S. 564, 571 (1976) (plurality opinion).  In other words, the Grand

Jury provides a "shield" against "arbitrary or oppressive action" by ensuring that serious criminal accusations will be brought "only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance." *Id*. And from a structural perspective, the importance of this individual "shield" against unfounded criminal prosecution is only heightened when it is contextualized with the substantial prosecutorial powers that the Executive Branch may legitimately exercise under Article II of the Constitution. *Cf. McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 406 (1819) (Marshall, C.J.) (noting that a proper constitutional interpretation depends upon a "fair construction of the whole instrument.").

Therefore, the first question presented to the Court is whether the Government's filing of something other than a Grand Jury indictment is sufficient to satisfy the relevant statutes of limitations absent the consent of the accused. For the reasons discussed herein, and upon reconsideration of the overall issue from other cases we have adjudicated, the Court holds that it is not.

### 1.   *The relevant procedural history of this prosecution.*

To reiterate, the Government initially levied its criminal accusations against Mr. De La Torre and his alleged co-conspirators, Mrs. De La Torre and Mr. McHomes, on August 11, 2020. None of the three defendants named in the Information waived his or her right to be prosecuted pursuant to an indictment from the Grand Jury. Nevertheless, the Government did not obtain its Superseding Indictment from the Grand Jury until February 10, 2022. The parties agree that the statutes of

limitations applicable to nine of the fourteen counts in the Superseding Indictment expired after the Information was filed but before the Superseding Indictment was returned.[19]

### 2.    *The applicable statutes of limitations.*

With respect to the nine counts in the Superseding Indictment that Mr. De La Torre is challenging, there are two different statutes of limitations that apply (even though every offense charged in the Superseding Indictment qualifies as a felony) because one of the nine counts is an alleged violation of the federal tax laws. *See, e.g.,* [D.E. 6 at 16-18] (penalty sheet). The first relevant statute of limitations provides that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found *or the information is instituted* within five years next after such offense shall have been committed." 18 U.S.C. § 3282 (emphasis added). The second relevant statute of limitations pertinently provides that no person shall be prosecuted, tried, or punished for any of the various offenses arising under the internal revenue laws "unless the indictment is found *or the information instituted*" within six years after the commission of the offense. 26 U.S.C. § 6531 (emphasis added).

---

[19]    Mr. De La Torre does not argue that the other five counts should be dismissed because of the applicable statutes of limitations. The Court therefore assumes that, with respect Count 1 (conspiracy to commit mail and wire fraud), Count 6 (mail fraud), Count 11 (wire fraud), Count 12 (conspiracy to commit money laundering), and Count 14 (filing a false tax return) of the Superseding Indictment, these accusations from the Grand Jury were properly and timely made.

### 3. The meaning of the verb "instituted."

The parties' first dispute essentially boils down to a disagreement over the correct interpretation of the verb "instituted" as it is used in 18 U.S.C. § 3282 and 26 U.S.C. § 6531. The Government submits that an information is "instituted" when it is filed on the docket. [D.E. 44 at 6]. By contrast, Mr. De La Torre argues that an information is "instituted" only when its filing is accompanied by the consent of the accused to proceed by information instead of indictment. [D.E. 41 at 4-6].

"The interpretation of a statute begins with its language." *United States v. St. Amour*, 886 F.3d 1009, 1013 (11th Cir. 2018) (citing *Watt v. Alaska*, 451 U.S. 259, 265 (1981)). "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton Cty.*, 140 S.Ct. 1731, 1738 (2020). "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives." *Id*. Accordingly, the first task is to determine whether the language at issue has a "plain and unambiguous" meaning as to a particular dispute. *St. Amour*, 886 F.3d at 1013. To do so, "we orient ourselves to the time of the statute's adoption" and begin by "examining the key statutory terms" before "assessing their impact" on the case at hand and "confirming our work" against precedent. *Bostock*, 140 S.Ct. at 1738-39.

### (a) The historical meaning of the verb "instituted."

What we know today as 18 U.S.C. § 3282 was originally enacted as part of the Crimes Act of 1790, our first federal criminal laws, and it provided that "no person or

persons shall be prosecuted . . . for any offence . . . unless the indictment or information for the same shall be found or instituted within two years from the time of committing the offence[.]"[20]  Therefore, it is important to understand what the word "instituted" meant to the people who authorized the statute in 1790. *See Bostock*, 140 S. Ct at 1738-39; *see also Spencer v. Specialty Foundry Products Inc.*, 953 F.3d 735, 740 (11th Cir. 2020) ("To determine the ordinary meaning of an undefined statutory term, we often look to dictionary definitions for guidance.") (internal quotations omitted).

When the Crimes Act of 1790 became law, to "institute" meant "[t]o fix; to establish; to appoint; to enact; to settle; to prescribe."[21]  Notably absent from this contemporaneous definition is the verb "file," which is the Government's preferred interpretation.  Nevertheless, some of the other terms within this definition help shed light on our inquiry.  For example, to "establish" meant "[t]o settle firmly; to fix unalterably."[22]  And to "appoint" meant, among other things, "to supply with all things necessary."[23]

---

[20]    Act of April 30, 1790, ch. 9, § 32, 1 Stat. 119 ("Crimes Act of 1790"); *see also Crimes Act*, FED. JUD. CTR., https://www.fjc.gov/history/timeline/crimes-act.

[21]    *Institute*, SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1st folio ed. 1755); *see also Institute*, JOHN ASH, THE NEW AND COMPLETE DICTIONARY (2d ed. 1795) (adding "to decree," "to instruct," and "to form by instruction" to the foregoing definition).

[22]    *Establish*, SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1st folio ed. 1755).

[23]    *Appoint*, SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1st folio ed. 1755).

The textual structure of Section 32 of the Crimes Act of 1790 provides additional insight into what it meant to "institute" an information. The law provided:

> That no person or persons shall be prosecuted, tried or punished for treason or other capital offence aforesaid, wilful murder or forgery excepted, unless the indictment for the same shall be found by a grand jury within three years next after the treason or capital offence aforesaid shall be done or committed; nor shall any person be prosecuted, tried or punished for any offence, not capital, nor for any fine or forfeiture under any penal statute, unless the indictment *or information* for the same shall be found *or instituted* within two years from the time of committing the offence, or incurring the fine or forefeiture aforesaid: Provided, That nothing herein contained shall extend to any person or persons fleeing from justice.

Crimes Act of 1790, § 32 (emphasis added). Read in context, the structural relationship between the phrases "indictment" being "found" and "information" being "instituted" indicates that the charging documents were intended to function identically within the criminal justice system (i.e., both documents were meant to effectively begin the prosecutorial process). After all, one of the fundamental purposes of a criminal statute of limitations is to avoid the injustice of a conviction based on evidence that has been eroded by the passage of time. Thus, if one were to restate this provision, it would be accurate to say that it prohibited the prosecution of any person for a non-capital offense *unless the prosecutor established its foundational charging document before the limitations period expired*.

It therefore strains credulity to say that an information alleging a felony would be "instituted" in 1790 without the consent of the accused because the accused's

consent is necessary to prosecute the charges alleged in the information.[24]  Absent

that consent, the information cannot be the foundation upon which the prosecution

moves forward; by contrast, a waiverless information must be amended by the filing

of a new foundational charging document – an indictment – before the prosecution of

the accused can proceed.  The meaning of the word "institute" in 1790 therefore

suggests that the information, which must be "instituted" before the limitations

period expires, must be sufficient to move the criminal adjudication process forward

if it is going to satisfy the statute of limitations.[25]

---

[24]     Although the Fifth Amendment right to indictment was not ratified until 1791, shortly after the Crimes Act of 1790 became law, it must be remembered that the distinction between indictments and informations evolved in English law and predated the founding of our nation.  *See, e.g., Costello*, 350 U.S. at 361-62; 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND IN FOUR BOOKS 305 (4th ed. 1770) ("But these informations (of every kind) are confined by the constitutional law to mere misdemeanors only: for, whenever any capital offence is charged, the same law requires that the accusation be warranted by the oath of twelve men, before the party shall be put to answer it.").  Moreover, the First Congress drafted, edited, and sent the Bill of Rights to the states for ratification *before* it enacted the Crimes Act of 1790.  *See, e.g.,* AKHIL AMAR, THE WORDS THAT MADE US: AMERICA'S CONSTITUTIONAL CONVERSATION, 1760 – 1840 314 (2021).

[25]     Although a bit tangential, the verb "institute" also appears in one of the most important documents drafted in the Eighteenth Century.

> We hold these truths to be self-evident: that all men are created equal; that they are endowed, by their Creator, with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness. That to secure these rights, governments are *instituted* among men, deriving their just powers from the consent of the governed; that whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it, and to *institute* a new government, laying its foundation on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness.

For additional context, consider the fact that, in 1948, when Congress extensively revised the federal criminal laws and codified this statute of limitations in its current location, 18 U.S.C. § 3282, it retained the verb "instituted."[26]  The meaning of "institute" in 1948, although perhaps somewhat clearer for our purposes than its meaning in 1790, did not change considerably: "to inaugurate or commence; as to institute an action."[27]  And unlike in 1790, Federal Rule of Criminal Procedure 7, which permitted an accused's waiver of their right to indictment, was in effect at the time of the 1948 codification – further supporting the notion that Congress consistently understood the verb "institute" to imply the instituted information's ability move the criminal process forward.[28]

Of course, there is another statute of limitations at issue in this case, 26 U.S.C. § 6531, and its legal history can be traced back to the Post-Reconstruction Era.[29]

---

DECLARATION OF INDEPENDENCE (U.S. 1776) (emphasis added).  Is it fair to say that a government can be "instituted" without having the power to engage in the process of governing?  And what are we to make of the assertion that the institution of our government requires the "consent" of the governed?

[26]    *See* Act of June 25, 1948, ch. 645, 62 Stat. 683; *see also* John L. McClellan, *Codification, Reform, and Revision: The Challenge of a Modern Federal Criminal Code*, 1971 DUKE L.J. 663, 683-85 (1971) (discussing the revision process).

[27]    *Institute*, BLACK'S LAW DICTIONARY (3d ed. 1933).

[28]    FED. R. CRIM. P. 7 advisory committee notes to 1944 amendment ("Opportunity to waive indictment and to consent to prosecution by information will be a substantial aid to defendants, especially those who, because of inability to give bail, are incarcerated pending action of the grand jury, but desire to plead guilty. This rule is particularly important in those districts in which considerable intervals occur between sessions of the grand jury.").

[29]    Act of July 5, 1884, ch. 225, 23 Stat. 122 ("Tax Crime Limitations Act").

When Congress passed the Tax Crime Limitations Act in 1884, it provided that "no person shall be prosecuted . . . for any of the various offenses arising under the internal revenue laws of the United States unless the indictment is found or the information instituted within three years next after the commission of the offense[.]"[30] As it turns out, "institute" meant essentially the same thing in the 1880s as it did in the 1790s, and the 1940s, and today: "[t]o inaugurate or commence; as to institute an action."[31]

> (b)     The relevance of defining "instituted" properly.

Putting all these pieces of evidence together, it follows textually that for an information to be "instituted," some process must flow from that institution. This finding supports Mr. De La Torre's preferred interpretation because, as we confirm below, the filing of an information standing alone is insufficient to put the process prescribed by the Federal Rules of Criminal Procedure into motion absent the consent of the accused to be prosecuted by that information.

> (c)     Precedent confirms the meaning of "instituted."

As a threshold matter, binding precedent requires us to give additional weight to Mr. De La Torre's proposed interpretation because criminal statutes of limitations "protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time" and are therefore "liberally interpreted in favor of repose." *Toussie v. United States*, 397 U.S. 112, 114-15 (1970).

---

[30]     *Id*.

[31]     *Institute*, BLACK'S LAW DICTIONARY (1st ed. 1891); *see also Institute*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To begin or start; commence.").

Accordingly, any doubts as to the limitations period "should be construed in favor of the defendant." *United States v. Gilbert*, 136 F.3d 1451, 1454 (11th Cir. 1998). This standard has been applied since the nation's founding and remains good law today. *See, e.g., Adams v. Woods,* 6 U.S. (2 Cranch) 336 (1805) (interpreting Section 32 of the Crimes Act of 1790 broadly because doing otherwise would be "utterly repugnant to the genius of our laws."). With that in mind, we proceed to consider whether our interpretation of the verb "instituted" is confirmed by judicial precedent.

The Court agrees with the parties that neither the Supreme Court nor the Eleventh Circuit has squarely addressed the issue presented by the procedural history in this case. At the time of this writing, the Eleventh Circuit has not yet ruled in the appeal of *United States v. B.G.G.*, Case No. 21-10165 (11th Cir. 2021), a remarkably similar case wherein Judge Middlebrooks held that the Government's filing of a waiverless information did not "institute" the information for statute of limitations purposes. *United States v. B.G.G.*, Case No. 20-cr-80063, D.E. 19 (S.D. Fla. Jan. 11, 2021); *but see, e.g.*, *United States v. Rosecan*, 528 F. Supp. 3d 1289, 1294 (S.D. Fla. 2021) (Ruiz, J.) (reaching the opposite conclusion); *United States v. Sanfilippo*, 572 F. Supp. 3d 1269, 1272-78 (S.D. Fla. 2021) (Altman, J.) (same). Accordingly, and as these earlier decisions have relied on, the Government turns to a Seventh Circuit case, specifically *United States v. Burdix-Dana*, 149 F.3d 741 (7th Cir. 1998), to justify its preferred interpretation of the verb "instituted."

In *Burdix-Dana*, the defendant was accused of a criminal violation less than one week before the five-year statute of limitations would have precluded her

prosecution. *Id*. at 742 (citing 18 U.S.C. § 3282). The government made this accusation by filing a waiverless information in the Southern District of Indiana. *Id*. A few weeks later, however, a Grand Jury indicted the defendant for the same conduct that was alleged in the information. *Id*. The defendant, who refused to waive her constitutional right to be indicted for her alleged crime, moved to dismiss the indictment because it was returned after the five-year statute of limitations. *Id*. In a curt three-page opinion, the Seventh Circuit affirmed the denial of the defendant's motion to dismiss because, in its view, an information is "instituted" for the purposes of 18 U.S.C. § 3282 when it is "filed" with the court. *Id*. at 742-43. Thus, the Seventh Circuit expressly rejected the argument that the proper interpretation of "instituted" requires the filing of an information plus the consent of the accused to proceed by information. *Id*. at 743.

Putting aside for a moment that *Burdix-Dana* is not binding on this Court, the case itself is cursorily reasoned and thereby less persuasive. For example, the Seventh Circuit made no reference whatsoever to the text of the Constitution that provided the defendant's right to be prosecuted pursuant to a Grand Jury indictment; nor did the opinion consider the practical and historical importance of that right. If it had done so, then it may have considered and addressed that discerning the meaning of "instituted" is not merely a question of statutory interpretation but also a nuanced issue of constitutional criminal procedure. *See United States v. B.G.G.*, Case No. 20-cr-80063, D.E. 19 at 12-16 (S.D. Fla. Jan. 11, 2020) (discussing the

16

history of 18 U.S.C. § 3282 and its relationship with the Fifth Amendment).  That

nuance is described persuasively in Judge Middlebrooks's decision:

> In my view, § 3282 presupposes that an instituted information can initiate a criminal prosecution.  After all, an information is a charging instrument whose primary practical purpose, aside from apprising a defendant of the charges against him, is to commence a prosecution.  It would be inconsistent with the Fifth Amendment and Federal Rule of Criminal Procedure 7 to recognize an invalid charging document as a mere mechanism for extending a statute of limitations period, though the same legal instrument could not serve to initiate criminal proceedings on the charges contained therein or confer subject matter jurisdiction on the court in which those proceedings are to take place.

*Id.* at 12.

The Seventh Circuit's opinion did not address this point.  It instead then

summarily rejected a "policy" argument raised by the defendant, who expressed

concern that, by conflating "instituted" with "filed" and then applying the tolling

provision of 18 U.S.C. § 3288, prosecutors would have a license to "file an information,

wait indefinitely, then present the matter to a grand jury well beyond the statute of

limitations but within six months of the dismissal of the information." *Burdix-Dana*,

149 F.3d at 743.  But this reasoning is flawed because this is not a *policy* argument;

it is a *constitutional* argument because the accused has a constitutional right to a

"speedy" trial and that right accrues upon the filing of an information. U.S. Const.

amend. VI; *United States v. Marion*, 404 U.S. 307, 320 (1971) ("[I]t is readily

understandable that it is either a formal indictment or information or else the actual

restraints imposed by arrest and holding to answer a criminal charge that engage the

particular protections of the speedy trial provision of the Sixth Amendment."); *see*

*also United States v. Ewell*, 383 U.S. 116, 120 (1966) (noting that the Sixth

Amendment guarantee of speedy trial is "an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself.").

Moreover, having overlooked the constitutional implications of the case, *Burdix-Dana* ultimately ignored the express command from the Supreme Court that "criminal limitations statutes are to be liberally interpreted in favor of repose." *Toussie*, 397 U.S. at 115 (internal quotations omitted); *see also Repose*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "repose" as a "statutory period after which an action cannot be brought in court").[32]   Failing to discuss the foregoing areas of concern, the opinion in *Burdix-Dana* also neglected to meaningfully engage with *Jaben v. United States*, 381 U.S. 214 (1965), a case that is arguably binding on this Court and is certainly highly instructive with respect to Mr. De La Torre.

In *Jaben*, the defendant was accused of criminal tax evasion one day before the applicable statute of limitations was set to expire.  *Id.* at 216.  The government made

---

[32]    Of course, "repose" was not defined in the Sixth Edition of Black's Law Dictionary and so perhaps this error should be forgiven.  But *Burdix-Dana* also declined to consult any dictionary for insight into the meaning of the word "institute," which as a contemporaneous verb meant "[t]o inaugurate or commence; as to institute an action."  *Institute*, BLACK'S LAW DICTIONARY (6th ed. 1990).  By contrast, the verb "file" had multiple definitions: "[t]o lay away and arrange in order, pleadings, motions, instruments, and other papers for preservation and reference"; "[t]o deposit in the custody or among the records of a court"; "[t]o deliver an instrument or other paper to the proper officer or official for the purpose of being kept on file by him as a matter of record and reference in the proper place"; "[i]t carries the idea of permanent preservation as a public record."  *File*, BLACK'S LAW DICTIONARY (6th ed. 1990).  Here, however, we see that treating "institute" and "file" as necessarily synonymous can result in error.

this formal accusation by securing a criminal complaint from a Commissioner of the United States – a historical precursor to the United States Magistrate Judge – and then filing that complaint on the docket in the Western District of Missouri. *Id.* Having determined that the complaint showed probable cause to believe that the defendant committed the alleged offense, the Commissioner issued a summons ordering the defendant to appear at a preliminary hearing the following month. *Id.* No preliminary hearing occurred, however, because the government subsequently obtained a Grand Jury indictment against the defendant for the same conduct alleged in the complaint, relying on a portion of 26 U.S.C. § 6531 that provided for a nine-month extension of the applicable limitations period if a complaint was "instituted" before the expiration of that limitations period. *Id.*[33] The defendant moved to dismiss the indictment as barred by the statute of limitations, but the government argued that the indictment was timely because it was returned within the nine-month window following the filing of the complaint. *Id.*

At issue before the Supreme Court in *Jaben* was whether an adequate showing of probable cause was necessary to give effect to the nine-month extension provided by 26 U.S.C. § 6531. *Id.* at 217. The defendant argued that probable cause was required and, accordingly, that the indictment should be dismissed because the complaint at issue did not meet this probable cause threshold. *Id.* at 216. By contrast, the government argued that probable cause was "not relevant to the

---

[33]     To be clear, 26 U.S.C. § 6531 uses the verb "instituted" twice – the first referring to the institution of an information and the second referring to the institution of a complaint. In *Jaben*, the Supreme Court dealt with the second verb; here, we deal with the first.

complaint's ability to initiate the extension of the limitation period" because, among other things, the complaint "stated the essential facts constituting the offense" and therefore its filing on the docket was sufficient to institute the complaint under 26 U.S.C. § 6531.   *See id*. at 215-18 ("Where a complaint is *instituted* before a commissioner of the United States within the period above limited, the time shall be extended . . . .") (emphasis added) (quoting 26 U.S.C. § 6531).  The Supreme Court rejected the government's argument; however, it ultimately found that the complaint was supported by probable cause and therefore affirmed the denial of the defendant's motion to dismiss.  *Id*. at 218-25.

The Supreme Court reasoned that, for a complaint to satisfy the applicable statute of limitations, the complaint must be "adequate to begin effectively the criminal process prescribed by the Federal Criminal Rules."  *Id*. at 220. Absent probable cause, therefore, a complaint is not *instituted* for statute of limitations purposes because a complaint lacking probable cause is insufficient to instigate "the next steps in the process" prescribed by the Federal Rules of Criminal Procedure.  *See id*. at 217-20 (discussing the applicable process that flows from instituting a complaint based on probable cause).

*Jaben* and *Burdix-Dana* are similar in at least three material ways: (1) both cases involve criminal defendants who were formally accused of their crimes *by something other than an indictment* on the eve of an expiring limitations period; (2) in both cases, the government secured an indictment from the Grand Jury after the applicable limitations period expired; and (3) in both cases, the government relied

upon the filing of the initial charging document to justify the timeliness of the subsequent indictment.  But *Jaben*, unlike *Burdix-Dana*, considered the meaning of the word "institute" within the greater framework of our criminal justice system, making it a more persuasive authority regardless of its binding status.[34]

Notwithstanding its implications, the panel decision in *Burdix-Dana* limited its discussion of *Jaben* to one concise footnote, noting that:

> *Jaben* did consider the meaning of the term "institute," but in the context of a different statute governing criminal complaints, not informations. The considerations that led the Court to its conclusion in *Jaben* were specific to the statute under review, and therefore the case is distinguishable from the one we currently address.

*Burdix-Dana*, 149 F.3d at 742 n.1.

Upon taking a fresh look at the entire matter, we cannot agree that the reasoning of *Jaben* is inapplicable to our case.  Both the statute at issue in *Jaben* and the statute at issue in *Burdix-Dana* are implicated here.  Moreover, both statutes use the verb "instituted" instead of "filed."  *Compare* 18 U.S.C. § 3282 *with* 26 U.S.C. § 6531.  The correct definition of "instituted," which connotes the information's ability to instigate a criminal process against the accused, is aligned with the definition of "instituted" that was adopted by the Supreme Court in *Jaben*.

    (d)    *"Instituted" and "filed" are therefore not synonymous.*

---

[34]   *See United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1223 (11th Cir. 2012) ("When interpreting a statute . . . . we analyze the language of the provision at issue, the specific context in which that language is used, and the broader context of the statute as a whole. If this analysis reveals that the provision has a plain and unambiguous meaning with regard to the particular dispute in the case and the statutory scheme is coherent and consistent, then our inquiry is complete.") (internal quotations and citations omitted) (emphasis added).

Given how *Jaben* defined "instituted," we cannot follow other decisions that deemed "instituted" as being synonymous with "filed."[35]  In *Rosecan*, for instance, Judge Ruiz concluded that the "plain language" of 18 U.S.C. § 3282 was "unambiguous" with respect to the meaning of the word "instituted" and therefore the statutory interpretation inquiry need go no further.  *Rosecan*, 528 F. Supp. 3d at 1293 (citing *St. Amour*, 886 F.3d at 1013).  In his view, the meaning of the word "institute" was unambiguously synonymous with the word "file."  *Id.*

In Chapter 213 of Title 18 of the United States Code, the chapter that prescribes the various limitations periods for federal crimes, Congress chose to use

---

[35]     In *United States v. Webster*, Case No. 20-cr-20172, D.E. 35 (S.D. Fla. Sept. 27, 2021), this Court previously recommended against granting a similar motion to dismiss.  In doing so, we relied in knee-jerk fashion on *Burdix-Dana* and omitted any discussion of *Jaben*.  We also discounted Judge Middlebrooks's historical analysis of the statute as being irrelevant given the apparent lack of ambiguity in the text's usage of what we perceived to be synonymous terms.  But upon further review, we find that our reliance on *Burdix-Dana* was misplaced, as was our criticism of a deeper historical dive into the issue.  Consistency is important, but when the Court finds error in its previous work, it has the duty to recognize that error and correct it. *Hudson Specialty Ins. Co. v. Snappy Slappy LLC*, No. 5:18-CV-00104-TES, 2019 WL 1938801, at *1 (M.D. Ga. May 1, 2019) (granting reconsideration; "Sometimes . . . a Court just gets it wrong. This is one of those cases. When that happens, a Court is at its best when it acknowledges its mistake, owns it without offering excuses, and then fixes it.").  Moreover, although *Webster* mistakenly relied on *Burdix-Dana,* the result we reached – denying the motion to dismiss the superseding indictment – was right on its facts.  In *Webster*, the government filed an information in May 2020, while Grand Jury service was suspended in the Southern District of Florida because of the pandemic.  Less than ten weeks after Grand Jury service resumed, however, the government obtained a superseding indictment against the Webster brothers.  Where the government was similarly diligent in obtaining an indictment after Grand Jury service resumed, at least one court has held that equity may appropriately toll the statute of limitations. *See United States v. Xavier*, Case No. 20-cr-80054, D.E. 111 at 6-8 (S.D. Fla. Sept. 8, 2021).  But, as discussed *infra*, such diligence cannot be found in this case.

the word "file" instead of "institute" multiple times. *See, e.g.,* 18 U.S.C. § 3288 ("This section does not permit the filing of a new indictment or information where the reason for the dismissal was the failure to *file* the indictment or information within the period prescribed by the applicable statute of limitations, or some other reason that would bar a new prosecution.") (emphasis added); 18 U.S.C. § 3294 ("No person shall be prosecuted . . . unless the indictment is returned or the information is *filed* within 20 years after the commission of the offense) (emphasis added); 18 U.S.C. § 3300 ("No person may be prosecuted . . . unless the indictment or the information is *filed* not later than 10 years after the commission of the offense.") (emphasis added).

Although "file" and "institute" could conceivably mean the same thing, in hindsight it does not necessarily follow that these words are necessarily and unambiguously synonymous when Congress uses one word in one section of Chapter 213 and the other word in another section of Chapter 213. *See, e.g., Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) ("The whole-text canon refers to the principle that a judicial interpreter should consider the entire text, in view of its structure and of the physical and logical relation of its many parts, when interpreting any particular part of the text.") (internal quotations omitted and alterations adopted); *United States v. Castleman*, 572 U.S. 157, 174-75 (2014) (Scalia, J. concurring) ("[T]he presumption of consistent usage [is the canon of statutory interpretation that provides] that a term generally means the same thing each time it is used. Although the presumption is most commonly applied to terms appearing in the same enactment, it is equally relevant when Congress uses the same language

in two statutes having similar purposes.") (internal quotations and citations omitted); ANTONIN SCALIA & BRIAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) ("And likewise, where the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea. If it says *land* in one place and *real estate* later, the second provision presumably includes improvements as well as raw land.") (emphasis in original).

In *Sanfilippo*, an opinion which followed *Rosecan,* Judge Altman reached the same result as Judge Ruiz after engaging in a detailed review of the issue. *Sanfilippo*, 572 F. Supp. 3d at 1272-78.[36]  Judge Altman, like this Court in *Webster*, ultimately decided to follow *Burdix-Dana*; he did so, however, expressly because its "central premise" was implicitly adopted by Congress when Congress amended 18 U.S.C. § 3282 in 2003 and, in doing so, left the phrase "information is instituted" unaltered. *Id.* at 1277.  Because "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," Judge Altman concluded that Congress adopted the definition of the verb "institute" provided by *Burdix-Dana* in 1998 when it left the

---

[36]     Despite its depth of treatment and its initial persuasiveness, *Sanfilippo*, like *Burdix-Dana* and *Rosecan*, failed to heed the command of the Supreme Court that criminal statutes of limitations are to be interpreted "liberally in favor of repose." *Toussie*, 397 U.S. at 115.  Additionally, like we failed to do in *Webster, Sanfilippo* did not meaningfully engage with *Jaben* and instead reiterated what the Seventh Circuit said in *Burdix-Dana. Sanfilippo*, 572 F. Supp. 3d at 1277 n. 12 ("*Jaben* is inapposite here because it involved a different statute[.]").  That distinction obviously does not help us since we are dealing with the same statute *Jaben* analyzed.  It also overlooks the deeper constitutional problems associated with its interpretation.

verbiage unchanged during a 2003 amendment.  *Id.* at 1277-78 (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)).

The Judge's analysis of this factor is compelling at first blush.  But again, on further review, Judge Altman's observation that the 2003 amendment of 18 U.S.C. § 3282 resulted in Congress' implicit adoption of the definition provided by *Burdix-Dana* undervalues the significance of *Jaben*.   It seems far more compelling to recognize that Congress, whilst amending 18 U.S.C. § 3282, was aware of what *the Supreme Court* had said on the topic as opposed to a conclusory opinion from the Seventh Circuit.  In that case, we should look to *Jaben* for Congress' understanding and implicit adoption of the definition of "instituted."  This means that Congress implicitly agreed that, to "institute" a charging document that is not an indictment, more is required than merely filing that document on a public docket.  And, even if *Burdix-Dana* could have been considered by Congress, assuming it was considered at all, it was more likely than not seen as an aberration in conflict with *Jaben* despite *Burdix-Dana*'s proclamation to the contrary. At the very least, because the presumption of implicit congressional adoption relied on by *Sanfilippo* is inapplicable in cases where there is not a "settled judicial construction," we cannot be "justified in presuming Congress, by its silence, impliedly approved" of *Burdix-Dana. See United States v. Powell*, 379 U.S. 48, 55 n. 13 (1964).

In *Powell*, the Supreme Court considered whether the Internal Revenue Service needed probable cause to believe that a fraudulent tax return had been filed before it had the authority to re-examine a taxpayer's records.  *Id.* at 49-51.   The

25

statute authorizing re-examination was silent with respect to a probable cause requirement, but the taxpayer argued that a probable cause requirement nevertheless existed because Congress re-enacted the statute without substantial modification after a handful of District Courts and Circuit Courts held that the statute required a showing of probable cause before a re-examination could properly commence. *Id*. at 55 n. 13. But the Supreme Court determined that this smattering of lower court opinions could not justify the presumption of Congress' silent acquiescence because it did not reflect a "settled judicial construction" of the statute. *Id*. And so, the Supreme Court declined to write a probable cause requirement into the law. *Id*. at 55-59. By that measure, we therefore cannot agree that the handful of lower court opinions released before Congress amended 18 U.S.C. § 3282 in 2003 justifies a presumption of implicit congressional adoption because these cases do not reflect a "settled judicial construction" of the issue.[37]

By contrast, the cases cited by *Sanfilippo* cover – at most – a statutory interpretation acknowledged in only ten states and the District of Colombia by 2003. Indeed, nearly 20 years later, the debate among the parties (and the courts) rages on as we patiently wait for the Eleventh Circuit to clarify the ambiguity surrounding the

---

[37]    In addition to *Burdix-Dana*, *Sanfilippo* identifies the following cases in support of its finding that Congress implicitly acquiesced to their statutory interpretation: *United States v. Thompson*, 278 F.3d 1244 (10th Cir. 2002) (relying on *Burdix-Dana* to determine when an indictment is properly "found" under 18 U.S.C. § 3282); *United States v. Lewis*, No. 02-cr-0341, 2003 WL 1193256 (N.D. Ill. Mar. 11, 2003) (citing *Burdix-Dana* with approval); *United States v. Hsin-Yung*, 97 F. Supp. 2d 24 (D.D.C. 2000) (same); *United States v. Watson*, 941 F. Supp. 601 (N.D.W. Va. 1996) (reaching the same result as *Burdix-Dana* before *Burdix-Dana* was published).

meaning of the verb "institute" in the relevant statutes of limitations.  In our view, the point Judge Altman was making is quite an important one but, in this case, it actually leads us to a different conclusion.

The application of the presumption of implicit congressional adoption is appropriate in situations where the Supreme Court has weighed in on the meaning of a statute before Congress amends that statute. *See Lorillard*, 434 U.S. at 580-85 (discussing Congress' presumed awareness of Supreme Court precedent in employment discrimination cases); *Keene Corp. v. United States*, 508 U.S. 200, 210-13 (1993) (discussing Congress' presumed awareness of Supreme Court precedent defining a relevant statutory term); *cf. Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 643-61 (2007) (Ginsburg, J. dissenting) (prompting Congress to pass the Lilly Ledbetter Fair Pay Act of 2009). Under those circumstances, the mythical presumption is far more likely to have a basis in actual fact – a relevant consideration given our obligation, which we have repeatedly stressed, to interpret criminal statutes of limitations liberally in favor of repose – because Supreme Court interpretations of statutes are, by their very nature, capable of providing a "settled judicial construction" of the statute at issue.

It then follows that, contrary to Judge Altman's conclusion in *Sanfilippo*, it is inappropriate to apply the presumption of implicit congressional adoption in this case and conclude that Congress silently made *Burdix-Dana* the law of the land.  At best, the correct application of this canon of construction means *Jaben* has far more weight and relevance to this issue than these other decisions suggest.

Accordingly, for purposes of these statutes of limitations, we no longer agree that they unambiguously use "institute" and "file" as synonyms of each other. A more nuanced analysis of each term is required in order to satisfy the governing principle, which remains good law today, set forth in *Jaben*: to "institute" a non-indictment charging document, the document must be capable of moving the prescribed criminal process forward. Thus, we turn to the specific process at issue in this case to assess the merit of Mr. De La Torre's argument.

### 4.    *Most of the charges against Mr. De La Torre were not timely "instituted."*

Federal Rule of Criminal Procedure 7(a) provides that a felony offense "must be prosecuted by an indictment" if it is punishable by death or imprisonment of more than one year, which is consistent with the Fifth Amendment's guarantee of prosecution by indictment for "capital" and otherwise "infamous" crimes. Rule 7(b) provides the exception to this rule, however, because it allows the prosecution to proceed by "information" if the defendant "waives prosecution by indictment" in open court after being advised of the nature of the charges and of their rights as a criminal defendant.

Rule 9(a) then provides that "[t]he court must issue a warrant—or at the government's request, a summons—for each defendant . . . named in an information if one or more affidavits accompanying the information establish probable cause to believe that an offense has been committed and that the defendant committed it."[38]

---

[38]    Rule 8 is not concerned with process but rather the permissible substance of indictments and informations.

It follows then that an information filed without an affidavit, like the Information filed against Mr. De La Torre, mandates no additional action from either the Court or the Government. Indeed, as the Seventh Circuit noted in *Burdix-Dana*, a waiverless information is insufficient to mandate the service of process.[39]

The next major step in the criminal process is the arraignment, which is governed by Rule 10. At the arraignment, three crucial events occur in open court: (1) the court ensures that the defendant has a copy of the indictment or information; (2) the court explains the substance of the charges to the defendant; and (3) the court asks the defendant to plead to the indictment or information. FED. R. CRIM. P. 10(a). Importantly, a defendant *cannot* be arraigned on an information unless he has first consented in open court to prosecution by information. *See United States v. McIntosh*, 704 F.3d 894, 904 (11th Cir. 2013) ("[A]n indictment is a necessary (unless waived) prerequisite to the prosecution of cases and must be filed prior to arraignment, the point at which a defendant is asked to reply to a charge by way of a plea."); FED. R. CRIM. P. 10 advisory committee's note to 2002 amendment ("The amendment does not permit waiver of an appearance when the defendant is charged with a felony information. In that instance, the defendant is required by Rule 7(b) to be present in court to waive the indictment."). Put differently, a defendant who refuses to waive his constitutional right to an indictment cannot be arraigned without an indictment.

---

[39]   "Burdix-Dana argues that filing the information does not necessarily require notice to the person charged therein; thus it is possible that a person could fail to assert her rights not for lack of diligence, but for lack of notice. This issue is not relevant here because in this case Burdix-Dana did have notice of the charges pending against her." *Burdix-Dana*, 149 F.3d at 743 n. 3.

As should be obvious by now, an information is insufficient to move the criminal process prescribed by the Federal Rules of Criminal Procedure beyond the filing of that information absent the consent of the accused.   Thus, under the reasoning of *Jaben*, filing an information without the consent of the accused is insufficient to "institute" the information because the accused's consent is necessary to move the criminal process forward.   *Jaben*, 381 U.S. at 220.   Accurately defined, a waiverless information is merely a document wherein a prosecutor publicly accuses someone of criminal misconduct.   Although that public accusation may be sufficient for some purposes, such as the accrual of the "speedy" trial right, it does not by itself begin a criminal process against the accused because the accused has a constitutional right to answer such accusations only when they come from a Grand Jury of his peers.

The importance of the Fifth Amendment right to indictment reinforces why *Jaben* correctly focused on the procedural effect of filing something other than an indictment, and the Supreme Court's command in *Toussie* to interpret criminal statutes of limitations liberally "in favor of repose" lends additional support for our holding that an information is "instituted" under 18 U.S.C. § 3282 and 26 U.S.C. § 6531 *only when the information is accompanied by the accused's waiver of his right to indictment*.   To hold otherwise would grant the Government a license to disregard the applicable statutes of limitations and thereby ignore the fundamental framework of our criminal justice system.   *See Jaben*, 381 U.S. at 219 ("The Government's interpretation . . . provides no safeguard whatever to prevent the Government from

30

filing a complaint at a time when it does not have its case made, and then using the nine-month period to make it.").

Consider, for example, the case of Mrs. De La Torre. She was accused at the same time as her husband and Mr. McHomes, but, more than two years later, she has neither waived her right to indictment nor been indicted by a Grand Jury. And has the Government moved to dismiss the Information against Mrs. De La Torre in the intervening time? No. By contrast, as the Government creeps toward the trial of her husband, it has allowed these accusations to dangle over her head like the Sword of Damocles.

Our criminal justice system has guardrails to protect against this type of coercive tactic – a constitutional guarantee of indictments that put a layer of people between prosecutors and their prosecutions; statutes of limitations that extinguish the lingering threat of punishment after a certain amount of time; and rules of criminal procedure that provide for fairness and the appearance of fairness – but these safeguards will be fatally compromised if the Judiciary grants the Executive the power to prolong a prosecution indefinitely merely by filing a criminal accusation on a public docket.

Counts Two, Three, Four, Five, Seven, Eight, Nine, Ten, and Thirteen of the Superseding Indictment should be **DISMISSED WITH PREJUDICE** because these allegations are barred by the applicable statutes of limitations. Dismissal with prejudice, as opposed to dismissal without prejudice, is appropriate because the six-month extension authorized by 18 U.S.C. § 3288 cannot properly operate in this

situation.  To be clear, nine of the fourteen counts in the Superseding Indictment should be dismissed because the Superseding Indictment was returned after the applicable limitations periods.  Because the Information was not "instituted" during the applicable limitations periods, the Superseding Indictment cannot relate back to August 11, 2020, the date when the Information was filed.  *See United States v. Italiano*, 894 F.2d 1280, 1282-83 (11th Cir. 1990) (discussing the ability of a superseding indictment to be considered "timely" filed if the original indictment was timely filed); 18 U.S.C. § 3288 ("This section does not permit the filing of a new indictment or information where the reason for the dismissal was the failure to file the indictment or information within the applicable statute of limitations, or for some other reason that would bar a new prosecution.").

### 5. *Equitable tolling is not appropriate in this case.*

Because the Court finds that most of the counts in the Superseding Indictment should be dismissed because they are time-barred, the Court must now address the Government's request to equitably toll the relevant statutes of limitations.  We decline to grant this request.

"Equitable tolling" is the doctrine under which plaintiffs may sue after the statutory time period has expired if they have been prevented from suing due to inequitable circumstances.  *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998) (citing *Bailey v. Glover*, 88 U.S. 342, 347 (1874)).  Precedent exists for applying the doctrine of equitable tolling in the criminal context.  *See, e.g., United States v. Midgley*, 142 F.3d 174, 179 (3d Cir. 1998) ("[C]riminal statutes of

limitations are subject to tolling . . . . [which] may be appropriate if . . . the plaintiff has 'in some extraordinary way' been prevented from asserting his rights.") (internal citations omitted).   And the disruption caused by the COVID-19 pandemic has previously justified equitable tolling in the criminal context.   *See United States v. Xavier*, Case No. 20-cr-80054, D.E. 111 at 7-8 (S.D. Fla. Sept. 8, 2021)

The Court should deny the Government's request to equitably toll the applicable statutes of limitations because of the pandemic's impact on Grand Jury service in the Southern District of Florida; nothing in the record supports such extraordinary relief.   *See, e.g., Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000) ("Equitable tolling is an extraordinary remedy which is typically applied sparingly."); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999) ("Equitable tolling is appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence.").   With the exception of Count 13, whose six-year limitations period expired in September 2021, the Government had more than one year to timely secure an indictment after Grand Jury service resumed in November 2020.

The Government has not shown why this failure was beyond its control and therefore worthy of equitable tolling.   Although the prosecutor notes that he managed to secure *three* indictments between January 2021 and July 2021, he offers no context for whether this number is remarkably small or large for someone in his position. [D.E. 44 at 2-3]. Moreover, referencing these three indictments says nothing about the Government's efforts to indict Mr. De La Torre before March 2020, when the

pandemic had not yet impacted Grand Jury service, or after July 2021, when the prosecutor was apparently not occupied with the pursuit of other indictments.

Considering that, during this time, Mr. De La Torre was anxiously waiting for the Government to properly begin a prosecution so that he may have the opportunity to clear his name, equity does not favor the Government in this case. *Cf. Xavier*, D.E. 111 at 6-8 (S.D. Fla. Sept. 8, 2021) (holding the equitable tolling was appropriate where the government "diligently" presented the case to the Grand Jury only three weeks after Grand Jury service resumed).

**B.      *The Superseding Indictment must also be dismissed pursuant to the Sixth Amendment.***

Even assuming that our reconsidered analysis of the statutes of limitations is flawed, there is an independent basis to grant the motion.  The Sixth Amendment to the Constitution of the United States guarantees that, in all criminal prosecutions, the "accused" shall enjoy the right to a "speedy" and public trial.  U.S. CONST. amend. VI.  The accused's right to a speedy trial accrues at the moment of formal accusation, regardless of whether that accusation is made in an indictment by a Grand Jury or in an information filed by a prosecutor.  *See Marion*, 404 U.S. at 320.  That constitutional right has been infringed in this case.

In *Barker*, the Supreme Court established a four-prong test for determining whether a defendant's right to a speedy trial has been violated.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  The four factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the speedy trial right; and (4) the prejudice to the defendant.  *Id*.

None of the four *Barker* factors is "a necessary or sufficient condition" to the finding of a speedy trial violation. *Id*. at 533. Rather, they are "related factors" that must be considered together "with such other circumstances as may be relevant." *Id*. Nevertheless, a *Barker* analysis "must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Id*.

To trigger a *Barker* analysis, the defendant must allege that the length of the delay between the indictment and trial is presumptively prejudicial. *Doggett v. United States*, 505 U.S. 647, 652 (1992). Delays exceeding one year are generally found to be presumptively prejudicial. *United States v. Ingram*, 446 F.3d 1332, 1336 (11th Cir. 2006).

Here, the Court finds – and the Government concedes – that a *Barker* analysis is warranted because more than one year has elapsed since the filing of the Information, qualifying the delay of trial as presumptively prejudicial. *See id*.; *see also Marion*, 404 U.S. at 320. Accordingly, the *Barker* factors will be examined in turn.

Before we engage in that four-part discussion, however, we should define the timeline that we are concerned with because this is not a case where the delay should be measured in the typical fashion (i.e., from the date of indictment to the date of trial). By contrast, we are primarily concerned with the time that elapsed between the filing of the Information on August 11, 2020, and the return of the Superseding Indictment on February 10, 2022 – an approximate span of eighteen months. This is so for two reasons. First, as we have discussed, Supreme Court precedent instructs

that the "speedy" trial right accrues when a formal criminal accusation is made by the prosecutor, which in this case occurred through the filing of the Information. And second, after the Superseding Indictment was returned, Mr. De La Torre agreed to waive his right to a speedy trial from April 6, 2022, to November 30, 2022.[40]

### 1.   *The length of the delay.*

The Supreme Court has recognized that the first *Barker* factor is a "double enquiry" because it constitutes a threshold consideration for the Court that, if necessary, must be subsequently weighed and balanced against the other factors discussed in the analysis. *See Doggett*, 505 U.S. at 651. Although the Government concedes that the post-Information delay triggers a *Barker* analysis, it offers no argument with respect to the weight that should be attached to this factor.

During the second part of the "double enquiry," the Court may consider the length of any pre-Information delay in addition to the length of the post-Information delay to determine how heavily this factor should weigh against the Government because the rationale for presuming prejudice is that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *See Ingram*, 446 F.3d at 1339 (quoting *Doggett*, 505 U.S. at 655). In *Ingram*, the Eleventh Circuit held the first *Barker* factor weighed heavily against the government when a two-and-a-half-year pre-indictment delay compounded a two-year post-indictment delay. *Id.*

---

[40]   [D.E. 32, 52].

Although the eighteen-month post-Information delay in this case is marginally less than the post-indictment delay in *Ingram*, the pre-Information delay is remarkably longer.  Mr. De La Torre submits, and the Government does not dispute, that the investigation in this case began in 2014, approximately six years before the Information was filed.  More to the point, however, both the Information and the Superseding Indictment allege criminal conspiracies that began in April 2008 – *more than fourteen years ago*. [D.E. 1, 6].  To be fair, the alleged conspiracies may not have been on the Government's radar before 2014, but that does not change the fact that this remarkable passage of time effectively compounds the damage done by the eighteen-month post-Information delay at issue here.  Any eyewitness to the entirety of the alleged conspiracies, whether that be Mr. De La Torre, Mrs. De La Torre, Mr. McHomes, or some other person, will necessarily be testifying, in part, based on a fourteen-year-old memory that has undoubtedly eroded with the passage of time.  Accordingly, the Court finds that the length of the delay weighs heavily against the Government.

### 2. *The reason for the delay.*

The Government submits only one reason for the delay in this case: Mr. De La Torre's refusal to waive his constitutional right to be indicted by a Grand Jury.  [D.E. 51 at 14].  Without this waiver, the Government represents that it was "powerless" to prosecute the case.  *Id*.

The irony of the prosecutor blaming the victim is not lost on the Court, but that irony is immaterial because a defendant has "no duty to bring himself to trial."

*Ingram*, 446 F.3d at 1337 (quoting *Barker*, 407 U.S. at 527).  Assuming, for the sake of argument, that Mr. De La Torre's assertion of his constitutional right to an indictment was the only reason for the delay, the Court cannot accept that the Government was "powerless" to do anything about it.  The Government could have, for example, accelerated its pursuit of the Superseding Indictment.

It must be noted pragmatically that, with few exceptions, jury trials were suspended in the Southern District of Florida until July 19, 2021, because of the health risks associated with COVID-19, and this suspension resulted in a substantial backlog of criminal trials.[41]  This reality cannot be attributed to the Government by any means.  But it does not excuse the Government's failure to diligently secure the Superseding Indictment (and thereby begin the prosecution against Mr. De La Torre) either before Grand Jury service was suspended on March 26, 2020, or reasonably soon after Grand Jury service resumed on November 17, 2020.  Thus, the true reason for the delay is two-fold: first, the Government failed to secure an indictment against Mr. De La Torre at any time between the beginning of its investigation in 2014 and the suspension of Grand Jury service in 2020; and second, it chose to prioritize other cases above Mr. De La Torre's based in part on the mistaken belief that filing the Information was sufficient to get the ball rolling.

In light of the foregoing, it is easy for us to find that the reason for the delay weighs against the Government. *See Ingram*, 446 F.3d at 1337-38 (finding that the reason for the delay weighed against the government when it failed to timely apprise

---

[41]     S.D. Fla. Admin. Order 2021-50; S.D. Fla. Admin. Order 2021-65.

the defendant of the charges levied against him).  But given the practical realities of the post-Information time period and the Government's good faith, albeit mistaken, reliance on *Burdix-Dana*, we cannot say that this prong weighs heavily against the Government.

### 3.    *The defendant's assertion of the speedy trial right.*

Mr. De La Torre has not asserted his right to a speedy trial in such express terms.  Indeed, he waived this right after the return of the Superseding Indictment.  But he has undoubtedly exercised his rights against the Government from the beginning by steadfastly refusing to waive his right to an indictment.  Thus, he has consistently pressed the Government to prosecute him within the framework prescribed by the Constitution.  And to reiterate, Mr. De La Torre had no obligation to bring himself to trial because it is the Government's burden to diligently prosecute those whom it accuses of crimes.  *See Barker*, 407 U.S. at 527.

> This does not mean, however, that the defendant has no responsibility to assert his right. We think the better rule is that the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right.

*Id*. at 528.  It is therefore left to the discretion of the Court to weigh this factor based upon the totality of the circumstances.  *Id*. at 528-29.

The Fifth Amendment guarantee of "indictment" by Grand Jury and the Sixth Amendment guarantee of a "speedy" criminal trial work together to ensure fairness in our criminal justice system.  Procedurally, the Fifth Amendment operates to ensure that prosecutions are not born from a prosecutor's whim but rather upon the reasoned judgment of the accused's peers and, after such a prosecution has begun,

the Sixth Amendment operates to bring about swift justice.  Accordingly, in our view, insisting on the first procedural right is sufficient to indicate a desire for the protection of the second.  As Mr. De La Torre correctly notes, to assert his speedy trial right during the eighteen-month period between the filing of the Information and the return of the Superseding Indictment, he would have been required to waive his right to indictment and thereby consent to proceed by information.

So, we cannot weigh this factor against Mr. De La Torre.  By contrast, this factor must weigh against the Government because it allowed the criminal accusations against Mr. De La Torre to sit in the public domain for eighteen months with the knowledge that Mr. De La Torre refused to waive his Fifth Amendment right and that, under Supreme Court precedent, Mr. De La Torre's Sixth Amendment clock was ticking.  *See, e.g., Marion*, 404 U.S. at 320; *see also United States v. Vispi*, 545 F.2d 328, 331-32 (2d Cir. 1976) (filing of a criminal information starts the speedy trial clock); *State v. Wright*, 404 P.3d 166, 178 (Alaska 2017) (holding that "speedy trial time begins to run with the filing of an information.").  But, for the same reasons discussed in our second prong analysis (i.e., pandemic disruption and the Government's reliance on *Burdix-Dana*), this factor cannot weigh heavily against the Government.

### 4.    *The prejudice to the defendant.*

Having found that the first three *Barker* factors weigh against the Government, but that two of those factors do not weigh heavily against the

Government, Mr. De La Torre has the burden of showing actual prejudice resulting from the delay.  *See Ingram*, 446 F.3d at 1340.

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant to adequately prepare his case skews the entire fairness of the system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Barker*, 407 U.S. at 532 (footnote omitted).  "[C]onsideration of prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim."  *Doggett*, 505 U.S. at 655; *see also United States v. Tigano*, 880 F.3d 602, 618 (2d Cir. 2018) ("Affirmative proof of impairment of the defense is not required in order to find a Sixth Amendment violation.").

Here, Mr. De La Torre submits that he has been prejudiced in several ways. His employer fired him in conjunction with the Government's filing of the Information.  Accordingly, he immediately felt the pain that flows from a public accusation of criminal misconduct.  He necessarily lost his source of income (and presumably lost his health insurance) in the early days of a global pandemic.  Any prospective employer would then have little trouble finding an account of the time Mr. De La Torre spent with his previous employer, and it is likely that such a prospective employer would assign significant weight to the facts alleged in the Information given that it bears the imprimatur of the Government.  His family's

41

name and reputation were besmirched; a cloud of anxiety formed over their house and there it remained for over a year before anyone but the prosecutor was asked to consider whether probable cause existed to make these accusations.

Beyond the personal repercussions endured by Mr. De La Torre, he must now defend against allegations that stretch all the way back to 2008, which may not seem like the distant past until one realizes that the alleged conspiracies began before our nation elected its first Black President. To say that memories have dimmed is an understatement. Moreover, Mr. De La Torre believes that much of the pertinent evidence against him involves documents provided to the Government by his former employer, but this employer has provided almost no documentation created before 2010. His ability to raise defenses arising out of the company's course of conduct, both before and during the alleged conspiracy period, are impaired by the passage of time and the absence of retained corporate documents. The Government disputes the weight of this prejudice because Mr. De La Torre had the ability to review the allegations against him beginning in August 2020, but this notion overlooks the fact that Mr. De La Torre was not entitled to (and did not receive) discovery until after the Superseding Indictment was returned.

Mr. De La Torre has suffered actual prejudice resulting from the Government's conduct in this case with respect to two of the three interests that the Sixth Amendment right to a speedy trial was designed to protect. The Superseding Indictment, in its entirety, should be **DISMISSED WITH PREJUDICE**. *Ingram*, 446 F.3d at 1340 (ordering the district court to dismiss the indictment because of a

Sixth Amendment violation); *Tigano*, 880 F.3d at 619 ("The only remedy is to dismiss the case with prejudice[.]") (citing *Strunk v. United States*, 412 U.S. 434, 440 (1973)).

### III.    CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge does hereby **RECOMMEND** that Defendant Mario Rene De La Torre's motion, [D.E. 41], be **GRANTED** and the Superseding Indictment, [D.E. 6], be **DISMISSED WITH PREJUDICE**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days to serve and file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C v Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 21st day of October, 2022.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge